**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| BEAM'S INDUSTRIES, INC., FINDLAY INDUSTRIES, INC., AND NM HOLDINGS COMPANY, LLC, <br><br> Individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TAKATA CORPORATION, TK HOLDINGS, INC., TOKAI RIKA CO., LTD., TRAM, INC., TOYODA GOSEI CO., LTD., TOYODA GOSEI NORTH AMERICA CORP., AND TG MISSOURI CORP., <br><br> Defendants. | Case No. 2:16-cv-10002 |

## CLASS ACTION COMPLAINT

Plaintiffs Beam's Industries, Inc., Findlay Industries, Inc., and NM Holdings Company, LLC (formerly known as Venture Holdings Company, LLC), individually and on behalf of the Plaintiff Class described below, bring this action against Defendants for damages and injunctive relief under the antitrust laws of the United States.

## SUMMARY OF THE CASE

1.     Defendants are manufacturers of Occupant Safety Systems (as defined below). Plaintiffs allege that Defendants conspired to rig bids for, and to fix, maintain, or stabilize the prices of Occupant Safety Systems sold in the United States from at least as early as January 1, 2003 through the present.  Plaintiffs further allege that they could not have discovered, and did not discover, Defendants' conspiracy at a time earlier than February 2011, and that Defendants fraudulently concealed their conspiracy.

2.      Plaintiffs bring this lawsuit as a class action on behalf of direct purchasers who, during the Class Period, purchased Occupant Safety Systems in the United States from one or more of the Defendants.  This action is brought under Section 1 of the Sherman Act to enjoin Defendants' anticompetitive conduct and recover damages suffered by the Class.

3.      As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class paid higher prices for Occupant Safety Systems than they would have paid in a competitive market.

## JURISDICTION AND VENUE

4.      Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.      The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.  Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in this District.

6.      By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court.   Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

## DEFINITIONS

7.     The term "Class Period," as used in this complaint, refers to the time period from January 1, 2003 through the present.

8.     The term "Occupant Safety Systems," as used in this complaint, refers to seat belts, airbags, steering wheels or steering systems, safety electronic systems, and related parts and components.

9.     The term "Defendant" or "Defendants," as used in this complaint, refers to, in addition to those named specifically above, all of the named Defendants' predecessors, including Occupant Safety Systems manufacturers merged with or acquired by the named Defendants and each named Defendant's wholly-owned or controlled subsidiaries or affiliates.

10.    References made herein to any corporation include any predecessors, successors, parents, subsidiaries, affiliates and divisions of that corporation.

## TRADE AND COMMERCE

11.    During the Class Period, each Defendant sold Occupant Safety Systems in the United States in a continuous and uninterrupted flow of interstate commerce.

12.    The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## PARTIES

*Plaintiffs*

13.    Plaintiff Beam's Industries, Inc. ("Beam's") is an Oklahoma corporation with its principal place of business located in Oklahoma City, Oklahoma.  Plaintiff purchased Occupant Safety Systems directly from one or more Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

14.    Plaintiff Findlay Industries, Inc. ("Findlay) is an Ohio corporation with its principal place of business located in Findlay, Ohio.  Plaintiff purchased Occupant Safety Systems directly from one or more Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

15.    Plaintiff NM Holdings Company, LLC ("NM Holdings"), formerly known as Venture Holdings Company, LLC, is a Michigan limited liability company with its principal place of business located in Fraser, MI.  Plaintiff purchased Occupant Safety Systems directly from one or more Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

16.    Plaintiff NM Holdings is herein asserting claims against all Defendants.  Plaintiffs Beam's and Findlay are herein asserting claims only against the Toyoda Gosei Defendants, as defined below, because Beam's and Findlay have asserted claims against all other Defendants in the Second Consolidated Amended Class Action Complaint pending before The Honorable Marianne O. Battani in *In re Automotive Parts Antitrust Litigation*, Occupant Safety Systems Case, 12-cv-00601-MOB-MKM (docket number 81).

*Takata Defendants*

17.    Defendant Takata Corporation is a Japanese corporation with its principal place of business located in Tokyo, Japan.  Defendant Takata Corporation – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold Occupant Safety Systems that were purchased in the United States, including in this District, during the Class Period.

18.    Defendant TK Holdings, Inc. is a Delaware corporation with its principal place of business in Auburn Hills, Michigan.  It is a subsidiary of and wholly-owned and controlled by its

Japanese parent, Takata Corporation. Defendant TK Holdings, Inc. sold Occupant Safety Systems that were purchased in the United States, including in this District, during the Class Period. During the Class Period, its activities were under the control and direction of Takata Corporation.

19.     Defendants Takata Corporation and TK Holdings, Inc. are referred to collectively herein as "Takata."

### *Tokai Rika Defendants*

20.     Defendant Tokai Rika Co., Ltd. is a Japanese corporation with its principal place of business located in Aichi, Japan. Defendant Tokai Rika Co, Ltd. – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold Occupant Safety Systems that were purchased in the United States, including in this District, during the Class Period.

21.     Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. ("TRAM") is a Michigan corporation with its principal place of business in Plymouth Hills, Michigan. It is a subsidiary of and wholly-owned and controlled by its Japanese parent, Tokai Rika Co., Ltd. Defendant TRAM sold Occupant Safety Systems that were purchased in the United States, including in this District, during the Class Period. During the Class Period, its activities were under the control and direction of Tokai Rika Co., Ltd.

22.     Defendants Tokai Rika Co., Ltd. and TRAM are referred to collectively herein as "Tokai Rika."

### *Toyoda Gosei Defendants*

23.     Defendant Toyoda Gosei Co., Ltd. ("Toyoda Gosei Co.") is a Japanese corporation with its principal place of business located in Aichi, Japan. Defendant Toyoda Gosei Co. –

directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold Occupant Safety Systems that were purchased in the United States, including in this District, during the Class Period.

24.    Defendant Toyoda Gosei North America Corp. is a Michigan corporation with its principal place of business located in Troy, Michigan.  It is a subsidiary of and wholly owned and controlled by its Japanese parent, Toyoda Gosei Co.  Toyoda Gosei North America Corp. sold Occupant Safety Systems that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities were under the control and direction of Toyoda Gosei Co.

25.    TG Missouri Corp. is a Missouri corporation with its principal place of business located in Perryville, Missouri.  It is a subsidiary of and wholly owned and controlled by its Japanese parent, Toyoda Gosei Co.  TG Missouri Corp. sold Occupant Safety Systems that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities were under the control and direction of Toyoda Gosei Co.

26.    Defendants Toyoda Gosei Co., Toyoda Gosei North America Corp., and TG Missouri Corp. are referred to collectively herein as "Toyoda Gosei."

27.    To the extent that subsidiaries, divisions and other affiliates within Defendants' corporate families sold Occupant Safety Systems to direct purchasers, these related entities played a material role in the conspiracy alleged in this complaint because Defendants intended to ensure that the prices paid for such Occupant Safety Systems would not undercut the artificially raised and inflated pricing that was the purpose and intended effect of Defendants' coordinated and collusive behavior as alleged herein.  Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling,

pricing, distributing or collecting monies from Plaintiffs and the members of the Class was known to and approved by their respective corporate parent named as a Defendant in this complaint.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

28.     The acts alleged in this complaint to have been done by TK Holdings, Inc., TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc., Toyoda Gosei North America Corp., and TG Missouri Corp. were authorized, ordered, and condoned by their parent companies and the acts alleged to have been done by the Takata, Tokai Rika, and Toyoda Gosei Defendants were authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of the Defendants' business affairs.

29.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this complaint.  Each defendant acted as the agent or joint venturer of or for other Defendants with respect to the acts, violations and common course of conduct alleged herein.

30.     Co-conspirators not named in this complaint include Autoliv, Inc., Autoliv ASP, Inc., Autoliv B.V. & Co. KG, Autoliv Japan Ltd. (collectively referred to herein as "Autoliv") and TRW Automotive Holdings Corporation and TRW Deutschland Holding GmbH (collectively referred to herein as "TRW").[1]

---

[1] Plaintiffs have settled with the Autoliv and TRW entities.

## CLASS ACTION ALLEGATIONS

31.     Plaintiffs bring this action both on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3). The Class is defined as follows:

> All direct purchasers of Occupant Safety Systems in the United States from one or more of the Defendants or their co-conspirators (or their controlled subsidiaries, affiliates, or joint ventures) from January 1, 2003 through the present.

32.     Plaintiffs do not know the exact number of Class members, such information being in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

33.     There are questions of law or fact common to the Class, including but not limited to the following:

        a.     Whether Defendants engaged in a contract, combination, or conspiracy to rig bids for, or to fix, raise, maintain, or stabilize prices of Occupant Safety Systems sold in the United States;

        b.     Whether Defendants agreed to allocate the supply of Occupant Safety Systems sold to direct purchasers in the United States on a model-by-model basis;

        c.     Whether Defendants' conduct caused Occupant Safety Systems to be sold at artificially high prices in the United States;

        d.     Whether Plaintiffs and other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

e.     Whether Plaintiffs and other members of the Class are entitled to injunctive relief and, if so, the nature and extent of such relief.

34.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

35.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly purchased Occupant Safety Systems from a Defendant, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiffs is common to the Class.

36.     Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of Occupant Safety Systems and have no conflict with any other members of the Class.  Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

37.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

38.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

39.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

40.     The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## FACTUAL ALLEGATIONS

**Occupant Safety Systems**

41.    Occupant Safety Systems are the parts in a motor vehicle that are designed to protect drivers and passengers from bodily harm, such as seat belts, airbags, steering wheels or steering systems, safety electronic systems and related parts and components.

42.    Seat belts are safety strap restraints designed to secure an occupant in position in a vehicle in the event of an accident.  A seat belt includes belt webbing, a buckle, a retractor, and hardware for installation in a vehicle.  Seat belts may also include a height adjuster, pretensioner, or other devices associated with the seat belt.

43.    Airbags are occupant restraints designed to control the movement of an occupant inside of a vehicle in the event of an accident.  An airbag consists of a light fabric airbag, an inflator, which through the use of pressurized gas (typically generated by pyrotechnic materials), rapidly inflates the airbag upon deployment, and an initiator to start the deployment.  Airbags may also include an injection molded plastic decorative cover or other devices associated with the airbag.

44.    Steering wheels consist of a die-cast armature (frame) covered by molded polyurethane and finished with leather, wood trim, or plastic.  Steering wheels may also include various electronic features and controls.

45.    Occupant Safety Systems are installed in new vehicles as part of the manufacturing process and later to replace worn out, defective or damaged parts.

46.    Occupant Safety Systems manufactured, distributed, or sold by Defendants and their co-conspirators during the Class Period are not functionally distinguishable in any material way.

**The Occupant Safety Systems Industry**

47.     There are high barriers to entry in the Occupant Safety Systems market due to high capital investment in plant and machinery and technical expertise.  As a result, the Occupant Safety Systems industry is heavily concentrated.

48.     The Occupant Safety Systems market is dominated by Defendants Takata, Tokai Rika, and Toyoda Gosei, and by Autoliv and TRW, which combined control nearly three quarters of the global market.  According to Autoliv's 2011 Annual Report, it is the "world's largest automotive safety supplier" and its sales represent more than 33% of the global market for Occupant Safety Systems.  TRW and Takata each account for 20% of the global market share for Occupant Safety Systems.  Toyoda Gosei is also a major participant in the global market for Occupant Safety Systems.

49.     Autoliv's 2011 Annual Report stated that in 2010 the global market sales for Occupant Safety Systems were $18.1 billion, of which the North American market accounted for $4.2 billion.

50.     In 2012, U.S. sales of airbags reached $6.7 billion, U.S. sales of seat belts were over $900 million, and U.S. sales of steering wheels and related components were $2.24 billion.

51.     Defendants and their co-conspirators have the capacity and expertise needed to manufacture Occupant Safety Systems that can be used in any motor vehicle.  Indeed, Defendants and their co-conspirators sell Occupant Safety Systems to every significant automobile manufacturer in the United States, Western Europe, and Japan.

52.     It is critically important for parts suppliers to maintain minimum viable scale in order to efficiently produce parts within the price and quantity parameters established by major

Original Equipment Manufacturers ("OEMs").  As a result, loss of position as a supplier of choice would have severe consequences to the business of Defendants and their co-conspirators.

**The Occupant Safety Systems Market is Conducive to Collusion**

53.     Several important economic characteristics of the market for Occupant Safety Systems plausibly increased its vulnerability to Defendants' price-fixing conspiracy.

54.     One economic characteristic of a market conducive to conspiratorial behavior is high barriers to entry.  There are substantial barriers to entry in the market for Occupant Safety Systems because of significant start-up capital expenditures.  A new entrant into the business would have to incur millions of dollars in costs, including large investments in plant and machinery, research and development, infrastructure for distribution, transportation, and labor.

55.     Additionally, the market for Occupant Safety Systems is highly concentrated. Defendants and their co-conspirators control nearly three-quarters of the market for Occupant Safety Systems.

56.     Inelastic pricing is another important characteristic.  When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic.  Otherwise, increased prices would result in declining use of the product, with a concomitant drop in revenues, profits, and, absent high barriers to entry, new firms would enter the market.

57.     Pricing for Occupant Safety Systems is highly inelastic.  Motor vehicle manufacturers must use Occupant Safety Systems because there are no viable substitute products.

## DEFENDANTS' ANTITRUST CONSPIRACY

58.     During the Class Period, Defendants and their co-conspirators, the dominant producers of Occupant Safety Systems, conspired to (a) rig bids for and allocate the supply of Occupant Safety Systems and (b) raise, fix, and maintain prices for Occupant Safety Systems sold in or into the United States.

59.     Defendants engaged in numerous acts in furtherance of the alleged conspiracy, as described below.

60.     Defendants participated in meetings, conversations, and communications to discuss bids and price quotations for Occupant Safety Systems sold in the United States.

61.     Defendants agreed during those meetings, conversations, and communications to rig bids and allocate the supply of Occupant Safety Systems sold in or into the United States.

62.     Defendants submitted bids and price quotations to motor vehicle manufacturers in accordance with their conspiratorial agreements.

63.     Defendants knew and intended that their pricing actions regarding their sales of Occupant Safety Systems to motor vehicle manufacturers would have a direct impact on prices for Occupant Safety Systems sold to all direct purchasers throughout the United States.

64.     Defendants engaged in a single price-fixing conspiracy involving Occupant Safety Systems that impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Occupant Safety Systems.   Defendants' scheme was implemented, it succeeded, and it affected the prices for all Occupant Safety Systems.

65.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to Requests for Quotation ("RFQs").   OEMs issue RFQs to motor vehicle parts suppliers to obtain prices for parts, including Occupant Safety Systems.

66.     OEMs use RFQs to procure parts for U.S.-manufactured motor vehicles in the United States and abroad.

67.     Typically, OEMs issue RFQs for motor vehicle parts, such as Occupant Safety Systems, approximately three years before the OEM begins vehicle production.

68.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (a) the OEM issues the RFQ to multiple parts suppliers, (b) the suppliers submit bids, (c) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing, (d) the suppliers submit revised bids, and (e) the OEM selects the winner.

69.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

70.     When an OEM purchases, for example, Occupant Safety Systems directly from the supplier to whom it awarded the contract, the OEM purchases the Occupant Safety Systems at the winning price.

71.     That winning price is also used when suppliers that were not part of the RFQ process purchase Occupant Safety Systems directly from the winning Occupant Safety Systems bidder for incorporation into products manufactured and sold to vehicle manufacturers.  Those suppliers, who directly purchase Occupant Safety Systems from the winning bidder, pay the winning bidder at least the winning price.

72.     It was important to the success of the cartel alleged herein that its members control and manipulate the prices paid by OEMs in order to control the prices paid by all other direct purchasers of Occupant Safety Systems.

73.    Direct purchasers of Occupant Safety Systems in addition to OEMs also paid supracompetitive prices as a result of Defendants' conspiracy because the price-fixed bid of the winner bidder established the floor at which all Occupant Safety Systems were sold to direct purchasers.

**Government Investigations and Guilty Pleas**

74.    Various U.S. and international governmental authorities, including the U.S. Department of Justice ("DOJ") via its Antitrust Division, are currently investigating anticompetitive conduct in connection with the production and sale of automotive parts, including Occupant Safety Systems.

75.    On February 23, 2010, Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. was raided by investigators from the Federal Bureau of Investigation ("FBI") as part of the DOJ antitrust probe.   DOJ spokeswoman Gina Talamona said that "[t]he antitrust division is investigating the possibility of anticompetitive cartel conduct" and is "coordinating with the European Commission and other foreign competition authorities."

76.    On February 8, 2011, the FBI raided the Auburn Hills, Michigan offices of Defendant TK Holdings, Inc., relating to an investigation of possible antitrust violations. Defendant Takata Corp. stated in its 2011 Annual Report that its U.S. subsidiary, TK Holdings, Inc., "became the subject to an investigation conducted by the Federal Bureau of Investigation . . . TK Holdings, Inc. is cooperating fully with the investigation."   Alby Berman, TK Holdings, Inc.'s vice president of marketing and public relations, said the subpoena "targeted safety system suppliers – seat belts, air bags, steering wheels and safety electronics – any communication with competitors, and specifically mentioned Tokai Rika," and requested communications dating back to January 1, 2005.

77.     Also on February 8, 2011, Autoliv ASP, Inc. received a grand jury subpoena from the DOJ.  Autoliv stated in its 2011 Annual Report that the subpoena pertaining to its subsidiary Autoliv ASP, Inc. "requested documents and information as part of a long-running investigation into possible anticompetitive behavior among certain suppliers to the automotive vehicle industry, including Autoliv."

78.     In a June 9, 2011 press release, Autoliv further acknowledged that European Commission ("EC") representatives visited two German facilities of Autoliv B.V. & Co. KG "to gather information for an inquiry into possible anti-competitive behaviors among certain suppliers to the automotive vehicle industry."

79.     TRW has also admitted that it is under investigation and is cooperating with both U.S. and international governmental antitrust authorities.  In its 2011 Annual Report, TRW acknowledged, "in June 2011, European antitrust authorities visited certain of our Occupant Safety Systems business unit locations in Germany to gather information.  We also received a subpoena related to the Antitrust Investigations in the United States from the U.S. Department of Justice."

80.     On June 6, 2012, the DOJ charged Autoliv with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain seatbelts, airbags and steering wheels" in violation of the Sherman Act.

81.     According to the criminal information filed against Autoliv, Autoliv and its co-conspirators carried out the conspiracy by:

a.      Participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to certain motor vehicle manufacturers for seatbelts, airbags, and steering wheels;

b.      Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain motor vehicle manufacturers for seatbelts, airbags, and steering wheels;

c.      Agreeing, during those meetings, conversations, and communications, to allocate the supply of seatbelts, airbags, and steering wheels sold to certain motor vehicle manufacturers on a model-by-model basis;

d.      Submitting bids and price quotations to certain motor vehicle manufacturers in accordance with the agreements reached;

e.      Selling seatbelts, airbags, and steering wheels to certain motor vehicle manufacturers at collusive and non-competitive prices; and

f.      Accepting payment for seatbelts, airbags, and steering wheels sold to certain motor vehicle manufacturers at collusive and non-competitive prices.

82.    Also on June 6, 2012, the DOJ announced that Autoliv had agreed to pay a $14.5 million criminal fine and plead guilty to a two-count criminal information charging Autoliv with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of seat belts, airbags, and steering wheels sold to automakers in the United States and elsewhere.  On June 21, 2012, Autoliv pleaded guilty to these charges.

83.    In a June 6, 2012 DOJ press release, Scott D. Hammond, Deputy Assistant Attorney General of the Antitrust Division's criminal enforcement program, stated, "[b]y meeting in secret and agreeing to allocate the supply of various automotive parts, the

conspirators colluded to rip off automotive manufacturers in the United States and abroad. These conspiracies eliminated competition and resulted in inflated prices to automotive manufacturers for parts in cars sold to U.S. consumers."

84.     Autoliv's President and CEO Jan Carlson stated in a June 6, 2011 news release that "[i]t is simply unacceptable that we have ended up in this situation in the first place.  It goes against everything we stand for."  He stated further, "[t]herefore, we have cooperated extensively with the DOJ to investigate and rectify the matter as quickly as possible and, as a result, we have reached an early resolution of our part of this industry-wide investigation."

85.     On July 30, 2012, the DOJ charged TRW Deutschland with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, seatbelts, airbags and steering wheels" in violation of the Sherman Act.

86.     According to the criminal information filed against TRW Deutschland, TRW Deutschland and its co-conspirators carried out the conspiracy by:

a.      Participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to certain motor vehicle manufacturers for seatbelts, airbags, and steering wheels;

b.      Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain motor vehicle manufacturers for seatbelts, airbags, and steering wheels;

c.      Agreeing, during those meetings, conversations, and communications, to allocate the supply of seatbelts, airbags, and steering wheels sold to certain motor vehicle manufacturers;

d.      Agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain motor vehicle manufacturers;

e.      Submitting bids, price quotations, and price adjustments to certain motor vehicle manufacturers in accordance with the agreements reached;

f.      Selling seatbelts, airbags, and steering wheels to certain motor vehicle manufacturers at collusive and non-competitive prices;

g.      Accepting payment for seatbelts, airbags, and steering wheels sold to certain motor vehicle manufacturers at collusive and non-competitive prices; and

h.      Engaging in meetings, conversations, and communications in Germany for the purpose of monitoring and enforcing adherence to the agreed upon bid rigging and price fixing conspiracy.

87.      Also on July 30, 2012, the DOJ announced that TRW Deutschland had agreed to pay a $5.1 million criminal fine and plead guilty to a one-count criminal information charging TRW Deutschland with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of seat belts, airbags, and steering wheels sold to automakers in the United States and elsewhere.  On September 25, 2012, TRW Deutschland pleaded guilty to this charge.

88.      TRW Automotive Chairman and CEO John Plant stated in a July 30, 2012 press release that "[t]he actions connected with the DOJ settlement announced today conflict with what TRW stands for and are not consistent with our policies."  "Once we learned of the investigation, we moved very quickly to cooperate with the DOJ and bring this matter to a resolution."

89.      On October 30, 2012, the DOJ announced that Defendant Tokai Rika Co., Ltd. agreed to plead guilty to a two-count criminal information and pay $17.7 million in criminal

fines with respect to automotive heater control panels. Tokai Rika was charged with (a) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, heater control panels in violation of the Sherman Act and (b) obstruction of justice in violation of 18 U.S.C. § 1512(b)(2)(B). On December 12, 2012, Tokai Rika pleaded guilty to these charges.

90.     The DOJ charged Defendant Tokai Rika Co., Ltd. with obstruction of justice after an executive of Tokai Rika, acting on the company's behalf, "directed employees to delete electronic data and destroy paper documents likely to contain evidence of antitrust crimes in the United States and elsewhere" in violation of 18 U.S.C. § 1512(b)(2)(B). According to a Crain's Detroit Business article, after learning that the FBI had executed a search warrant on its United States subsidiary, TRAM, a Tokai Rika executive "directed employees of its U.S. subsidiary to destroy and alter records that were to be furnished to a federal grand jury" sitting in the Eastern District of Michigan. The criminal information further noted that "some of the deleted electronic data and destroyed paper documents were non-recoverable."

91.     In an October 30, 2012 DOJ press release, Scott D. Hammond, Deputy Assistant Attorney General of the Antitrust Division's criminal enforcement program, stated that Tokai Rika "knew their actions would harm American consumers, and attempted to cover it up when caught. The division will continue to hold accountable companies who engage in anticompetitive conduct and who obstruct law enforcement."

92.     On October 31, 2012, Defendant Tokai Rika Co., Ltd. issued a news release stating that "to emphasize the seriousness of these matters, Tokai Rika's Chairman of the Board,

President and other board members and corporate officers will voluntarily return 10 percent of their compensation for a from three to one-month [sic] period starting in November 2012."

93.     On July 16, 2013, the DOJ charged Autoliv's Takayoshi Matsunaga with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seat belts" in violation of the Sherman Act.  Matsunaga was employed by Autoliv as Vice President of the Toyota global business unit at Autoliv Japan.  On September 26, 2013, Matsunaga pleaded guilty to this charge.

94.     On September 26, 2013, the DOJ charged Takata's Gary Walker with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, seatbelts" in violation of the Sherman Act.  Walker was employed by Takata's U.S. subsidiary, TK Holdings, as Director of Sales for Transplant Customer Seatbelt Products from 2003 to 2006 and as a Director of Transplant Customer Product Sales from 2006 until at least February 2010.  On November 13, 2013, Walker pleaded guilty to this charge.

95.     On October 9, 2013, the DOJ charged Defendant Takata with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain seat belts" in violation of the Sherman Act.

96.     According to the criminal information filed against Takata, Takata and its co-conspirators carried out the conspiracy by:

a.      Participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to certain motor vehicle manufacturers in the United States and elsewhere;

b.      Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain motor vehicle manufacturers in the United States and elsewhere;

c.      Agreeing, during those meetings, conversations, and communications, to allocate the supply of seatbelts sold to certain motor vehicle manufacturers in the United States and elsewhere on a model-by-model basis;

d.      Submitting bids, price quotations, and price adjustments to certain motor vehicle manufacturers in the United States and elsewhere in accordance with the agreements reached;

e.      Selling seatbelts to certain motor vehicle manufacturers in the United States and elsewhere at collusive and non-competitive prices;

f.      Accepting payment for seatbelts sold to certain motor vehicle manufacturers in the United States and elsewhere at collusive and non-competitive prices;

g.      Engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed upon bid rigging and price fixing conspiracy; and

h.      Employing measures to keep their conduct secret, including destroying documents.

97.   Also on October 9, 2013, Defendant Takata agreed to pay a $71.3 million criminal fine and plead guilty to a one-count criminal information charging Takata with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of seat belts sold to automakers in the United States and elsewhere.  On December 5, 2013, Takata pleaded guilty to this charge.

98.   According to an October 10, 2013 Reuters news article, in response to the DOJ's charges and criminal fine against Takata, its CEO Shigehisa Takada agreed to take a 30% cut in compensation while other directors agreed to take a 15% cut.

99.   On November 21, 2013, the DOJ charged Takata's Yasuhiko Ueno, Saburo Imamiya, and Yoshinobu Fujino with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts" in violation of the Sherman Act. According to the DOJ's November 21, 2013 press release, Ueno, Imamiya, and Fujino have each agreed to pay a $20,000 criminal fine and serve prison sentences of nineteen months, sixteen months, and fourteen months, respectively.

100.   Ueno was employed by Takata's U.S. subsidiary, TK Holdings, as Senior Vice President of Sales for the Transplant Sales Department from at least January 2006 through December 2007, by Takata in Japan as Deputy Director of the Customer Relations Division from January 2008 through June 2009, and by Takata in Japan as Director of the Customer Relations Division from June 2009 through at least February 2011.

101.   Imamiya was employed by Takata in Japan as General Manager for Customer Relations Department Nos. 1 and 2 from at least January 2008 to July 2009, and as Director of

Customer Relations Division and General Manager for Customer Relations Department No. 1 from July 2009 through at least February 2011.

102.    Fujino was employed by Takata in Japan as Manager for the Toyota group within the Customer Relations Division from at least January 2004 to June 2005, by Takata in Japan as Manager for the Mazda group within the Customer Relations Division from June 2005 to the end of 2007, and by Takata's U.S. subsidiary, TK Holdings, as Vice President of Sales for the Transplant Sales Department from the beginning of 2008 through at least February 2011.

103.    Gikou Nakajima, who is or was employed by Takata as the Director of the Customer Relations Division from as early as June 2005 to at least June 2009, has been indicted by a grand jury in the U.S. for violating U.S. antitrust laws.

104.    On September 29, 2014, the DOJ charged Defendant Toyoda Gosei Co. with participating in a "combination and conspiracy to suppress and eliminate competition by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels" in violation of the Sherman Act.

105.    According to the criminal information filed against Toyoda Gosei Co., Toyoda Gosei Co. and its co-conspirators carried out the conspiracy by:

a.    Participating in meetings, conversations, and other communications to discuss the bids and price quotations to be submitted to certain motor vehicle manufacturers;

b.    Agreeing, during those meetings, conversations, and communications, to allocate among certain motor vehicle manufacturers sales of automotive airbags and steering wheels;

    c.    Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain motor vehicle manufacturers;

    d.    Exchanging information on bids and price quotations to be submitted to certain motor vehicle manufacturers, in order to effectuate the agreements;

    e.    Submitting bids and price quotations to certain motor vehicle manufacturers in accordance with the agreements;

    f.    Selling automotive airbags and steering wheels to certain motor vehicle manufacturers at collusive and noncompetitive prices; and

    g.    Accepting payment for automotive airbags and steering wheels sold to certain motor vehicle manufacturers at collusive and noncompetitive prices.

106.    Also on September 29, 2014, the DOJ announced that Defendant Toyoda Gosei Co. had agreed to pay a $26 million criminal fine and plead guilty to a two-count criminal information charging Toyoda Gosei Co. with engaging in conspiracies to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags, steering wheels, and automotive hoses sold to automakers in the United States and elsewhere.

107.    Defendants and their co-conspirators manufactured Occupant Safety Systems (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) abroad for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) abroad for installation in vehicles manufactured abroad for export to and sale in the United States.

108.    Defendants and their co-conspirators (a) had meetings and communications to discuss bids and price quotations to be submitted to customers in the United States and elsewhere, (b) agreed on bids and price quotations to be submitted  to customers in the United

States and elsewhere, (c) agreed to allocate the supply of Occupant Safety Systems sold in the United States and elsewhere on a model-by-model basis, (d) submitted bids, price quotations, and price adjustments to customers in the United States and elsewhere in accordance with the agreements reached, and (e) sold Occupant Safety Systems to customers in the United States and elsewhere at collusive and noncompetitive prices.

### PLAINTIFFS' CLAIMS ARE TIMELY

109.   Plaintiffs incorporate by reference the allegations set forth above and adopt the same as though fully set forth herein.

110.   Plaintiffs and the members of the Class had no knowledge of the anticompetitive conduct, or of facts sufficient to place them on notice of the claims set forth herein, until at least February 2011, the date that raids of certain Defendants and their co-conspirators became public. As a result, Plaintiffs and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the earliest, February 2011.

111.   No information in the public domain was available to Plaintiffs and the members of the Class prior to February 2011, when the DOJ executed warrants and searched the offices of Defendant TK Holdings, Inc. in metropolitan Detroit.  Prior to that time, there was insufficient information to suggest that any one of the Defendants was involved in a conspiracy to price-fix and rig bids for Occupant Safety Systems.  For these reasons, the statute of limitations as to claims alleged herein did not begin to run until, at the earliest, February 2011.

112.   Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Class until at least February 2011.  Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Class, from at

least as early as January 2003 through at least February 2011. During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to the instant Complaint.

113.   Before at least February 2011, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct, and did not know before then that that they were paying supra-competitive prices for Occupant Safety Systems throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and the members of the Class that would have suggested to Plaintiffs that they were being injured by Defendants' conduct.

114.   The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

115.   By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing. Occupant Safety Systems are not exempt from antitrust regulation and, thus, Plaintiffs and the members of the Class reasonably considered it to be a competitive industry. Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered.

116.   Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral, rather than based on anticompetitive agreements. In making those false representations, Defendants misled Plaintiffs and members of the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer allocation, and price-fixing activities.

117.   Defendants' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

118.   In particular, Defendants and their co-conspirators participated in secret meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

119.   During these meetings, conversations, and communications, Defendants and their co-conspirators agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

120.   Defendants likewise agreed to allocate the supply of Occupant Safety Systems sold to customers in the United States and elsewhere.

121.   Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

122.   In accordance with agreements reached by Defendants, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

123.   Plaintiffs and members of the Class could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their illegal conduct.

124.   Plaintiffs received various pricing information from one or more of Defendants or their co-conspirators.  Plaintiffs had no way to know that these prices were higher than they should have been due to the conspiracy alleged herein.

125.   For these reasons, the statute of limitations applicable to Plaintiffs' and the Class's claims was tolled and did not begin to run until at least February 2011.

## ANTITRUST INJURY

126.    Defendants' conspiracy caused injury to Plaintiffs and members of the Class by suppressing price competition among Occupant Safety Systems manufacturers, thereby depriving all direct purchasers of Occupant Safety Systems of the benefits of a competitive market and setting prices of Occupant Safety Systems at artificially high levels.

127.    As a direct result of Defendants' conspiracy, Plaintiffs and members of the Class have been injured in their business or property in that they paid more for Occupant Safety Systems than they otherwise would have absent Defendants' anticompetitive conduct.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 – Horizontal Price-Fixing Against All Defendants)

128.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

129.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Occupant Safety Systems sold in or into the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

130.    The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

131.    The contract, combination or conspiracy resulted in an agreement, understanding, or concerted action among the Defendants in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices for Occupant Safety Systems sold in or

into the United States.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

132.    Defendants succeeded in rigging bids, fixing, raising, maintaining and stabilizing the prices of Occupant Safety Systems sold in or into the United States during the Class Period.

133.    For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

f.      Participating in meetings and conversations to discuss the bids and price quotations of Occupant Safety Systems to be submitted to direct purchasers in the United States and elsewhere;

g.      Agreeing on bids and price quotations to be submitted to direct purchasers in the United States and elsewhere;

h.      Agreeing to manipulate prices and allocate supply of Occupant Safety Systems sold in or into the United States in a manner that deprived direct purchasers of free and open competition;

i.      Submitting bids, price quotations, and price adjustments to direct purchasers of Occupant Safety Systems in accordance with the agreements reached;

j.      Selling Occupant Safety Systems to direct purchasers in the United States and elsewhere at supracompetitive prices; and

k.      Employing measures to conceal the true nature of their unlawful conduct from Plaintiff and other members of the Class in furtherance of the conspiracy.

134.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they

have paid more for Occupant Safety Systems than they would have paid in a competitive market unaffected by Defendants' anticompetitive conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.      That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      That Plaintiffs and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiffs and members of the Class recover their costs of this suit and reasonable attorneys' fees as provided by law;

F.      That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:   January 1, 2016                    Respectfully submitted,

                                            By:  /s/ David H. Fink
                                            David H. Fink (P28235)
                                            Darryl Bressack (P67820)
                                            **FINK + ASSOCIATES LAW**
                                            38500 Woodward Ave; Ste. 350
                                            Bloomfield Hills, MI 48304
                                            Telephone: (248) 971-2500
                                            dfink@finkandassociateslaw.com
                                            dbressack@finkandassociateslaw.com

                                            Interim Liaison Counsel for Direct Purchaser
                                            Plaintiffs

Gregory P. Hansel
Randall B. Weill
Jonathan G. Mermin
Michael S. Smith
**PRETI FLAHERTY, BELIVEAU**
 **& PACHIOS LLP**
One City Center, P.O. Box 9546
Portland, ME 04112
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
jmermin@preti.com
msmith@preti.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
**FREED KANNER LONDON**
 **& MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
**KOHN SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
**SPECTOR ROSEMAN KODROFF**
 **& WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Interim Lead Counsel for Direct Purchaser Plaintiffs

Joseph M. Fischer (P13452)
CARSON FISCHER, P.L.C.
4111 Andover Road West – Second Floor
West Building
Bloomfield Hills, MI 48302
Telephone: (248) 644-4840
jfischer@carsonfischer.com

Ruthanne Gordon
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Irwin B. Levin
COHEN & MALAD, LLP

Jeffrey S. Goldenberg
GOLDENBERG SCHNEIDER, LPA
35 East Seventh Street, Suite 600
Cincinnati, OH 45202
(513) 345-8291

Robert G. Eisler
GRANT & EISENHOFER P.A.
123 Justison Street, 7th Floor
Wilmington, DE 19801
(302) 622-7030

Linda P. Nussbaum
Nussbaum Law Group, P.C.
570 Lexington Ave., 19th Floor

One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481

M. John Dominguez
COHEN MILSTEIN SELLERS
& TOLL PLLC
2925 PGA Boulevard, Suite 204
Palm Beach Gardens, FL 33410
(561) 833-6575

Brent W. Johnson
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Ave. NW, Suite 500 West
Washington, D.C. 20005
(202) 408-4600

Lee Albert
GLANCY BINKOW & GOLDBERG LLP
77 Water Street, 7th Floor
New York, NY 10015
(646) 722-4180

Solomon B. Cera
GOLD BENNETT CERA & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
(415) 777-2230

W. Joseph Bruckner
LOCKRIDGE GRINDAL
NAUEN P.L.L.P.
100 Washington Avenue South
Minneapolis, MN 55401
(612) 339-6900

Lewis Goldfarb
MCELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
(973) 425-8689

Marvin A. Miller

New York, NY 10022
(212) 702-7054

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
(612) 338-4605

Robert N. Kaplan
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980

Daniel Hume
KIRBY MCINERNEY LLP
825 Third Avenue
New York, NY 10022
(212) 371-6600

Steven D. Irwin
LEECH TISHMAN FUSCALDO
& LAMPL, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219
(412) 261-1600

Steve Greenfogel
LITE DEPALMA GREENBERG, LLC
1521 Locust Street
Philadelphia, PA 19102
(215) 564-5182

Garret Blanchfield
REINHARDT, WENDORF
& BLANCHFIELD
E-1250 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
(651) 287-2100

R. Alexander Saveri
SAVERI & SAVERI, INC.

MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
(312) 332-3400

Jayne A. Goldstein
POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP
1792 Bell Tower Lane, Suite 203
Weston, FL 33326
(954) 315-3454

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 687-6611

706 Sansome Street
San Francisco, CA 94111
(415) 217-6810

Jason J. Thompson
SOMMERS SCHWARTZ PC
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300

Additional Counsel